**IN THE U.S. DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| **CASEY COPIER and JUSTIN COPIER** ) | **CASE NO.: 1:19-cv-00180** |
| ) | |
| **Plaintiffs,** ) | **JUDGE:** |
| ) | |
| **v.** ) | |
| ) | **COMPLAINT** |
| ) | **(JURY DEMAND ENDORSEMENT)** |
| **UNIVERSITY HOSPITALS HEALTH** ) | |
| **SYSTEM, INC.;** ) | |
| ) | |
| **and** ) | |
| ) | |
| **UNIVERSITY HOSPITALS** ) | |
| **CLEVELAND MEDICAL CENTER** ) | |
| **d/b/a as,** *inter alia***, University Hospitals** ) | |
| **Rainbow Babies & Children's Hospital** ) | |
| **and University Hospitals MacDonald** ) | |
| **Women's Hospital;** ) | |
| ) | |
| **and** ) | |
| ) | |
| **UNIVERSITY HOSPITALS AHUJA** ) | |
| **MEDICAL CENTER, INC.** ) | |
| ) | |
| **and** ) | |
| ) | |
| **UNIVERSITY HOSPITALS MEDICAL** ) | |
| **PRACTICE** ) | |
| ) | |
| **and** ) | |
| ) | |
| **COMPUTER AIDED SOLUTIONS LLC** ) | |
| **d/b/a CAS DATA LOGGERS** ) | |
| ) | |
| **Defendants.** ) | |

Now come Plaintiffs, Casey and Justin Copier (collectively, "Plaintiffs"), who herby bring the following Complaint against Defendants, University Hospitals Health System, Inc. ("University Hospitals," or "UH"), University Hospitals Cleveland Medical Center d/b/a as, *inter alia*, University Hospitals Rainbow Babies & Children's Hospital and University Hospitals

MacDonald Women's Hospital ("Cleveland Medical Center"), University Hospitals Medical Practice and University Hospitals Ahuja Medical Center, Inc. ("Ahuja Medical Center") (collectively, "the UH Defendants"), and Computer Aided Solutions LLC d/b/a CAS Data Loggers ("CAS") (collectively, "Defendants"), and hereby claim, allege, state, and aver as follows:

## **INTRODUCTION**

1.     The UH Defendants market and sell fertility services, including fertility treatment options, egg and embryo cryopreservation, and long-term freezer storage services. On the website and marketing materials of the University Hospitals Fertility Center (the "Center"), UH explains that "[o]ur team provides best-in-class care delivered with compassion and understanding."  UH also represents that the Center provides "an in-vitro fertilization program with IVF and andrology laboratories that feature the most advanced technology available."

2.     The use of appropriate technologies and maintenance protocols is necessary to ensure the safekeeping of cryopreserved eggs and embryos. Safe long-term storage requires appropriate storage tanks and systems, backup redundancies to guard against catastrophic failure of storage tanks and systems, regular inspections of storage tanks and systems, and automated temperature and fill-level gauges linked to alarm systems to notify staff immediately of a potential failure of storage tanks and systems.

3.     Plaintiffs Casey and Justin Copier are clients of the Center who trusted the Center to safeguard their embryos and eggs.  Tragically, Defendants' misconduct destroyed the embryos and eggs of Plaintiffs.  While nothing will ever return the Plaintiffs' embryos and eggs, this lawsuit seeks to hold UH, which operates the Center, and CAS, which provided the UH Defendants with temperature monitoring systems and/or alarms, responsible for this tragedy.

4.      Plaintiffs entrusted the Center with their dreams of having children, as well as their most sensitive and important property: their frozen embryos and eggs.

5.      This case concerns the UH Defendants violating their agreement to keep that trusted property safe in the Center's tissue storage tank in its IVF laboratory.  On the afternoon of March 3 through the early morning of March 4, 2018, the storage tank at the Center suffered a significant temperature fluctuation.  While the temperature variance sounded an alarm on the tank, nobody was at the Clinic to hear or answer the alarm.  A remote alarm system provided by CAS, which was designed to alert UH employees to a temperature fluctuation when the Center is not staffed, was turned off and had been off for a period of time.  As a result, the Center left Plaintiffs' embryos and eggs to perish, which were trapped in the storage tank at temperatures above those needed to protect them from irreparable damage.

6.      By the time the Center's staff returned on March 4, 2018, it was too late to save Plaintiffs' embryos or any of the eggs and embryos stored in the tank.  The temperature of the storage tank was too high, and the eggs and embryos stored within the tank were irreparably damaged.  Their viability was destroyed.

7.      Defendants did not protect Plaintiffs' embryos and eggs and destroyed any chance those eggs and embryos would become future children.

8.      Plaintiffs bring this case against Defendants to pursue redress for their lost eggs and embryos, and to prevent a similar tragedy from happening to them (and others) again.  Plaintiffs seek compensatory damages, punitive damages, equitable relief, and any and all other appropriate remedies from Defendants for their misconduct.

## JURISDICTION, VENUE AND PARTIES

9.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a) as the parties are citizens of different states, and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

10.     Venue is proper pursuant to 28 U.S.C. § 1391 because all Defendants have their principal place of business and a substantial part of the events and omissions giving rise to this claim occurred in this direct.

11.     At all relevant times herein and presently, Plaintiffs Casey and Justin Copier are/were residents of Utah County and State of Utah.

12.     On or about March 4, 2018, Plaintiffs' frozen embryos and eggs were destroyed while being stored at the University Hospitals Fertility Center, which is located in the Ahuja Medical Center in Beachwood, Ohio.

13.     Defendant University Hospitals Health System, Inc. is a tax-exempt 501(c)(3) corporation with its principal place of business in Shaker Heights, Ohio.

14.     Defendant University Hospitals Cleveland Medical Center is a tax-exempt 501(c)(3) corporation with its principal place of business in Shaker Heights, Ohio.  The Cleveland Medical Center does business as, *inter alia*, University Hospitals Rainbow Babies & Children's Hospital and University Hospitals MacDonald Women's Hospital.

15.     Defendant University Hospitals Medical Practices is a tax-exempt 501(c)(3) corporation with its principal place of business in Shaker Heights, Ohio.

16.     At all times relevant to this action, University Hospitals and/or University Hospitals Cleveland Medical Center and/or University Hospital Medical Practices operated the Ahuja Medical Center, which was opened in 2011.

17.     University Hospitals opened its Ahuja Medical Center as part of University Hospitals' "Vision 2010," which included University Hospitals' rapid expansion, resulting in the opening of several new facilities.

18.     Defendant University Hospitals Ahuja Medical Center, Inc. is one of University Hospitals' eleven community medical centers.  It is located at 3999 Richmond Road, Beachwood, Ohio.  The Ahuja Medical Center offers specialized services, including in-vitro fertilization ("IVF"), to Cleveland's eastern and southeastern communities, as well as Lake, Geauga and Summit counties.  Among its service offerings, the Ahuja Medical Center offers services through the UH Fertility Center.

19.     Defendant CAS Aided Solutions LLC d/b/a CAS Data Loggers ("CAS") is a limited liability company with its principal place of business in Chesterland, Ohio. CAS implements and/or maintains temperature monitoring systems and/or alarms including the temperature monitoring system and/or alarm used by the UH Defendants to ensure the safe, long-term storage of Plaintiffs' eggs and embryos.

## FACTUAL ALLEGATIONS

### I.   THE IVF PROCESS

20.     IVF is an invasive and technical process, involving multiple surgical procedures, laboratory fertilization and manipulation, and an intense drug regimen. The first step for IVF involves several weeks of drug therapy designed to hyper-stimulate the woman's reproductive system into producing multiple eggs as part of her monthly cycle. These eggs are harvested surgically and then fertilized with sperm in a laboratory. Once the eggs have been fertilized into embryos, they are cultured for 2-6 days in a growth medium. At that point, the embryos are either

cryo-preserved (vitrified) for later use, or if a fresh transfer is desired, they are then transferred directly into the woman's uterus.

21. IVF is most successful when the eggs used in the egg transfer are extracted from a woman before she is 38 years of age. A 2006 study by the American College of Obstetrics and Gynecology recognizes that eggs become more fragile with age. Rates of live births through IVF improve dramatically when the eggs used are donated by younger women.

22. During the process of cryopreservation, fertilized eggs, or pre-embryos, are preserved for future use. The fertilized eggs are first treated with a solution to protect them from damage during freezing. They are then gradually cooled to a temperature of minus-sixty to minus-eighty degrees centigrade and placed in liquid nitrogen for long-term storage. Once thawed, the undamaged, fertilized eggs can be transferred into the uterus.

23. IVF is typically an expensive and arduous process. To prepare for the process, fertility clients, such as Plaintiffs, often attend dozens of doctor appointments over the course of several months. During these visits, fertility clients undergo numerous ultrasounds and blood tests, so that doctors can determine when their bodies are ready to begin hormonal injections, as well as to determine their ovulation cycles.

24. In order to increase egg production, and thereby increase the chances for success, the first phase of the treatment involves the use of drugs to stimulate ovulation. The drugs are administered daily by injection for a little over two weeks, thereby stimulating the ovaries to increase egg production. During this time period, fertility clients often have to go to the Center nearly every other day for follow-up examinations and blood tests, which are used to calibrate a drug regimen.

25.    Added to this inconvenience, the physical and emotional side effects of hormone treatment can be horrible. On direction from doctors, fertility clients often have to give themselves up to three different injections per day, in varying amounts. The shots are painful and cause unnatural stomach bloating and sharp mood swings. Fertility clients, such as Plaintiff, can feel like they are on an emotional rollercoaster during this time. The medications also subject fertility clients to other risks, including the possibility of kidney failure, twisting of the ovary, ovarian rupture, and electrolyte problems that could require hospitalization.

26.    The total cost of IVF, including the medications involved and the implantation procedure, is typically very expensive.

## II.    THE UNIVERSITY HOSPITALS FERTILITY CENTER

27.    The Center, through its employees and agents, offer among other services, an IVF program with IVF and andrology laboratories.  University Hospitals claims and represents that its Fertility Center's laboratories "feature[s] the most advanced technology available."  Some of the treatment options University Hospitals offers at its Fertility Center are embryo cryopreservation, "[w]here excess embryos from a single procedure are frozen for implantation at a later date" and egg freezing, which "[a]llows a woman to electively freeze her eggs at a younger age for use at a later date."

28.    The use of appropriate technologies and maintenance protocols is necessary to ensure the safekeeping of cryopreserved eggs and embryos. Safe long-term storage requires appropriate storage tanks and systems, backup redundancies to guard against catastrophic failure of storage tanks and systems, regular inspections of storage tanks and systems, and automated temperature and fill-level gauges linked to alarm systems to notify staff immediately of a potential failure of storage tanks and systems.

29.     Egg and Embryo cryopreservation involves preservation of human eggs and embryos using cooling techniques.

30.     Plaintiffs are clients of the Center and store their eggs and embryos in the Center's storage tank.

31.     Plaintiffs trusted the Center to freeze and safely store their eggs and embryos for future use and preserve their ability to have children.

32.     A frozen egg allows a woman to preserve fertility if she is either not ready or unable to start a family at that time.  Some women choose to freeze their eggs for family planning or before undergoing treatment for cancer or other illnesses.

33.     Similarly, a frozen embryo allows a couple to preserve fertility for a future use. Some families choose to freeze their embryos for family planning or before undergoing treatment for cancer or other illnesses.

34.     Plaintiffs' frozen embryos were stored at the Center following IVF.

35.     At all times relevant to this action, Plaintiffs' embryos were under the UH Defendants' protection, custody, and control. The UH Defendants stored Plaintiffs' embryos within a liquid nitrogen storage tank at the Fertility Center that is housed at the Ahuja Medical Center.

## III.     PLAINTIFFS' FROZEN EMBRYOS WERE DESTROYED

36.     This tragedy could have been—and should have been—prevented.  For an extended period of time, the Center knew that the storage tank containing Plaintiffs' eggs and embryos needed preventative maintenance and that the tank was not functioning properly.  Although the tank was designed to fill liquid nitrogen automatically into a reservoir in the tank, that feature was not working properly.  The Center, however, did not transfer the embryos and eggs to another

storage tank.  Nor did it advise Plaintiffs that their eggs and embryos were being stored in a defective tank.

37.     Rather than transferring the eggs and embryos to another tank, for an extended period of time, the Center, through its employees and agents, were manually filling the storage tank by connecting a line to the storage tank with liquid nitrogen kept in the lab.

38.     The lab, however, ran out of liquid nitrogen that could be used to fill the tank's chamber by connecting a line with the tank.  For an extended period of time, including Friday, March 2, the Center took liquid nitrogen tanks from another lab in the building and poured the liquid nitrogen into the top of the storage tank rather than filling the tank's designated reservoir for the liquid nitrogen.  This is a technique that deviates from the manufacturer's guidelines.

39.     The Center reports that it checked the liquid nitrogen levels in the tank on Friday, March 2 and Saturday, March 3. The Center admits, however, that it now suspects the liquid nitrogen levels in the tank were too low – insufficient to keep the appropriate temperature to protect the thousands of eggs and embryos in the tank.

40.     On the afternoon of March 3 through the early morning of March 4, 2018, the storage tank holding Plaintiffs' eggs and embryos experienced a temperature fluctuation. Although the storage tank sounded an alarm, no one was at the facility to hear it.

41.     The Center also had an off-site monitoring program for the storage tank provided by CAS.  However, on March 3 and for a period of time before that date that alarm system was turned off.  Accordingly, the storage tank's temperature was left unmonitored from the afternoon of March 3 until the morning of March 4.

42.     When the Center's staff returned on the morning of March 4, 2018, the staff heard the alarm on the tank and discovered that thousands of frozen eggs and embryos belonging to its clients, including Plaintiffs, had been subjected to unsafe temperatures.

43.     From March 6 through March 8, Defendants contacted some, but not all of the individuals and families whose eggs and embryos were destroyed over the next few days.    Some received a generic letter addressed to "Community Member," dated March 7, 2018, that informed the families that eggs and embryos stored at the Center were subjected to an "unexpected temperature fluctuation." Defendants represented they were "investigating all of the facts to better understand the cause of the issue." These letters encouraged recipients to call a dedicated telephone line if they had any questions. However, these letters did not provide any specific details as to the condition of the recipient's eggs or embryos.

44.     On March 8, 2018, Cleveland-area media outlets reported that a storage tank at the Center had experienced a temperature fluctuation that damaged eggs and embryos. Defendants had indicated that approximately 700 families and 2,000 eggs and embryos were affected and that those families had received letters. Unfortunately, many individuals and families, including Plaintiffs learned of the temperature fluctuation and that their eggs and embryos were affected from the news media, not Defendants.  Sadly, some of these families also believed incorrectly that their eggs and embryos had survived the tragedy since they had not yet received a letter or call from Defendants.

45.     University Hospitals commenced an investigation to determine why the temperature rose in the tank, destroying or otherwise damaging Plaintiffs' eggs and/or embryos. Patricia DePompei, President of University Hospitals' Rainbow Babies & Children's Hospital, said that hospital staff members have consulted with experts to "better understand the cause of this temperature fluctuation and ensure that it doesn't happen again."  DePompei admitted to NBC

News that, "we do know that the temperature that was measured at a portion of the tank was higher than our acceptable limits."

46.    University Hospitals reported the incident to the federal regulators that monitor fertility clinics through Clinical Laboratory Improvement Amendments ("CLIA").  The U.S. Food and Drug Administration, Center for Medicaid Services, and Centers for Disease Control and Prevention, are responsible for CLIA, which regulates lab quality and requires state certification.

47.    In a video posted on Facebook, Patricia DePompei, on behalf of University Hospitals, said, "We are so very sorry this happened and we want to do all that we can to support our patients and families through this very difficult time."  DePompei is also reported to have characterized the event as being "absolutely devastating."

48.    On or about March 26, 2018, Plaintiffs received another letter from the UH Defendants. This letter provided additional details that were devastating to the individuals and families affected by the tragedy. First, the UH Defendants revealed that more eggs and embryos were affected than they first estimated. Instead of the approximately 700 families and/or individuals and 2,000 eggs and embryos thought to be affected, approximately 950 families and/or individuals and more than 4,000 eggs and embryos were affected. Second, the UH Defendants also explained that it is unlikely that any of the eggs and embryos are viable.  Third, the UH Defendants disclosed additional information on what happened at the lab, including that the tank needed preventative maintenance, the UH Defendants were filling the tank from the top, the embryology, IVF, lab ran out of liquid nitrogen and that the remote alarm on the affected tank, that was designed to alert the UH Defendants to temperature swings, was turned off and had been off for a period of time.

49.     The UH Defendants also admitted they are responsible for the failures at the lab and are sorry for causing "such a devastating loss."

50.     The remote alarm system referred to in the March 26, 2018 letter, was designed, implemented, and/or maintained by Defendant CAS. Defendant CAS had a duty to ensure that the UH Defendants were warned and/or notified when temperatures in the liquid nitrogen storage tanks rose above a certain level. Defendant CAS failed to provide timely warning and/or notification of the rise in temperature.

51.     On March 27, 2018, University Hospitals CEO Tom Zenty stated that "we know we made mistakes" and that this is a "terrible situation."

52.     Mr. Zenty explained that they knew Plaintiffs and others entrusted them to store their eggs and embryos were "woman and men who counted on us those who asked us to help them with their families"

53.     He went on to state "we can't give back what was lost" and "we failed our fertility clinic patients."

54.     Plaintiffs believed their eggs and embryos were their future children. They have suffered extreme emotional distress and grief regarding the loss of their embryos and the fact that they may now not be able to have as many children as they had hoped.

55.     Plaintiffs are now older than they were when they began the IVF process or egg freezing process.  Testimonials from doctors on the Center's website and medical literature indicates that Plaintiffs' chances for producing viable and strong eggs have decreased over the intervening time. Moreover, the financial and emotional costs of undergoing another painful and drawn-out IVF procedure, during which there is no guarantee that Plaintiffs will be able to produce strong and viable eggs for fertilization and transfer, are daunting.

56.     Plaintiffs have been damaged and injured in many ways, including without limitation the destruction of their stored embryos and eggs, which was extremely precious and unique property, the loss of their ability or chance of conception by using the stored embryos and eggs, the loss of their time and efforts committed to creating the frozen embryos and eggs, having to undergo surgical procedures and pain and suffering that were subsequently rendered futile and unnecessary by Defendants' actions and failures, and the mental anguish and emotional distress they have suffered.

57.     Defendants' failures rise to the level of malice defined by recklessness and/or willful and wanton misconduct and/or a conscious disregard for the rights and safety of Plaintiffs in a circumstance that had a great probability of causing substantial harm and, in fact, did cause substantial harm to Plaintiffs.

58.     Defendants' conduct, as aforesaid, constitutes punitive misconduct and exposes Defendants to punitive damages.

## CLAIMS FOR RELIEF

### COUNT I
### (NEGLIGENCE AGAINST UH DEFENDANTS)

59.     Plaintiffs repeat and reallege the above paragraphs as if fully restated herein.

60.     The UH Defendants owed Plaintiffs a duty to exercise care with respect to maintaining, inspecting, monitoring, and/or testing the liquid nitrogen storage tanks used for the preservation and storage of eggs and embryos at University Hospitals' Fertility Center.

61.     The UH Defendants breached those duties and/or were negligent in one or more of the following acts or omissions:

        a.   failing to maintain, inspect, monitor and/or test their liquid nitrogen
             storage tanks;

13

    b.   permitting the temperature to rise in one of their liquid nitrogen storage tanks "higher than [Defendants'] acceptable limits";

    c.   failing to recognize and adequately respond to alarm(s) that signified a temperature flux in the storage tank;

    d.   failing to properly safeguard and protect the eggs and embryos;

    e.   failing to have a backup tank available for immediate transfer of the eggs and embryos;

    f.   failing to maintain sufficient liquid nitrogen in the lab that could fill the tank as recommended by the manufacturer;

    g.   failing to follow known scientific and laboratory procedures; and/or

    h.   were otherwise careless and/or negligent.

62.    The UH Defendants were also grossly negligent and/or reckless for failing to exercise any or very slight care through one or more of the above-listed acts or omissions. Defendants acted willfully and/or wantonly with a conscious or reckless disregard for the rights of Plaintiffs that had a great probability of causing—and did cause—substantial harm.

63.    As a proximate result of one or more of the UH Defendants' negligent and/or grossly negligent acts and/or omissions, Plaintiffs suffered and continue to suffer injuries of a personal and pecuniary nature in an amount to be determined at trial.

## COUNT II
## (NEGLIGENCE AGAINST DEFENDANT CAS)

64.    Plaintiffs repeat and reallege the above paragraphs as if fully restated herein.

65.    Defendant CAS voluntarily undertook the affirmative duty to remotely monitor the temperature of the UH Defendants' liquid nitrogen storage tank holding Plaintiffs' eggs and embryos at the Center, and therefore had a duty to perform these services with a reasonable degree of care. Defendant CAS furthermore knew or should have recognized that its services were

necessary to protect Plaintiffs' eggs and embryos and that its failure to exercise such care would increase the risk of harm to Plaintiffs and their eggs and embryos stored within the tank.

66. Defendant CAS owed Plaintiffs a duty to ensure that the temperature monitoring system and/or alarm on the liquid nitrogen storage tank holding Plaintiffs' eggs and embryos was functioning at all times. Defendant CAS also owed a duty to warn the UH Defendants when the temperature in the storage tank rose above a certain level. Defendant CAS's failure to exercise reasonable care in rendering these services would result in an increased risk of harm to Plaintiffs and their embryos and eggs stored within the tank.

67. The UH Defendants told Plaintiffs that the Center had backup systems to protect their eggs and embryos from destruction caused by mechanical failures. Plaintiffs relied on the availability of such systems when storing their eggs and embryos at the Center. The services provided by Defendant CAS to remotely monitor the temperature in the storage tank were part of the backup systems promised to Plaintiffs. Defendant CAS thus undertook the duty owed by the UH Defendants to Plaintiffs to provide a backup system to protect Plaintiffs' eggs and embryos stored within the storage tank.

68. Plaintiffs relied on Defendant CAS's remote monitoring of UH Defendants' liquid nitrogen storage tanks when they entrusted the storage of their embryos and eggs to the UH Defendants.

69. Defendant CAS knew and/or should have recognized that a failure to alert the UH Defendants of a rise in temperature in the storage tank at the Center would increase the risk of harm to Plaintiffs and their embryos and eggs that were stored within the tank.

70. Defendant CAS breached those duties and/or was negligent in one or more of the following acts or omissions:

15

a. Creating and/or implementing and/or maintaining a defective temperature monitoring system and/or alarm;

b. Negligently, recklessly, and/or intentionally deactivating the temperature monitoring system and/or alarm despite having knowledge that such actions would result in irretrievable damage and/or destruction of Plaintiffs' eggs and embryos;

c. Failing to warn and/or notify the UH Defendants that the temperature monitoring system and/or alarm was not functioning and/or that the temperature in the liquid nitrogen storage tanks was rising to levels that would cause harm to Plaintiffs' eggs and embryos.

71.     Defendant CAS was also grossly negligent and/or reckless for failing to exercise care through one or more of the above-listed acts or omissions.  Defendant CAS acted willfully and/or wantonly with a conscious or reckless disregard for the rights of Plaintiffs that had a great probability of causing—and did cause—substantial harm.

72.     As a proximate result of one or more of the Defendant CAS's negligent and/or grossly negligent acts and/or omissions, Plaintiffs' embryos and eggs suffered physical harm and were destroyed.  Plaintiffs suffered and continue to suffer injuries of a personal and pecuniary nature in an amount to be determined at trial.

## COUNT III
## (BREACH OF CONTRACT AGAINST UH DEFENDANTS)

73.     Plaintiffs repeat and reallege the above paragraphs as if fully restated herein.

74.     The UH Defendants entered into oral and/or written contracts with Plaintiffs, wherein the UH Defendants agreed to store, preserve, protect and deliver, at a later date, those eggs and/or embryos to them.

75.     There was an agreement between Plaintiffs and the UH Defendants that the UH Defendants would use their best efforts to store, preserve, protect and deliver upon request Plaintiffs' frozen eggs and embryos, would notify Plaintiffs immediately if there was any problem,

16

and would thaw, transfer and/or dispose of the eggs and embryos only in the manner and at the time directed by Plaintiffs.

76.     When the UH Defendants agreed to store, preserve, protect and deliver on request Plaintiffs' frozen embryos and eggs, the UH Defendants were aware of the severe emotional distress and/or mental anguish that would result if the UH Defendants failed to keep these promises and breached the parties' agreement.

77.     In consideration of the UH Defendants' promises, Plaintiffs agreed to pay, and paid, fees for the services rendered.

78.     Plaintiffs performed all of the terms and conditions required of them under their contracts.

79.     Based on the conduct described herein, the UH Defendants breached their contracts with Plaintiffs by failing to preserve and protect Plaintiffs' eggs and embryos from irreparable damage.

80.     By reason of the UH Defendants' breach, Plaintiffs experienced irreplaceable damage to their eggs and embryos that they entrusted to the UH Defendants, which has caused monetary damages, severe emotional distress, and/or mental anguish, in an amount to be determined at trial.

<u>COUNT IV</u>
<u>(BAILMENT AGAINST UH DEFENDANTS)</u>

81.     Plaintiffs repeat and reallege the above paragraphs as if fully restated herein.

82.     Plaintiffs delivered to the UH Defendants for safekeeping personal property, their eggs and embryos, to be safely and securely kept and to be redelivered to them on demand.

83.     The UH Defendants received eggs and embryos from Plaintiffs on this condition.

17

84.     Plaintiffs agreed to pay, and paid, fees for in exchange for the UH Defendants' promise to keep their eggs and embryos in safekeeping.

85.     The UH Defendants had a duty to exercise ordinary care in the safekeeping of Plaintiffs' eggs and embryos delivered to it, and Defendants had a duty to return the eggs and embryos, undamaged, to Plaintiffs.

86.     The UH Defendants invited the general public, including Plaintiffs in particular, to entrust eggs and embryos to their care by holding themselves out to be a competent, capable, and established reproductive and storage facility able to handle and care for eggs and embryos in a satisfactory manner.

87.     Because of the UH Defendants' wrongful conduct, as set forth herein, Plaintiffs' property was irreplaceably damaged, which precludes redelivery of the property or any part of the property to Plaintiffs.

88.     The UH Defendants breached their duty to exercise ordinary care in the safekeeping of Plaintiffs' eggs and embryos delivered to the UH Defendants and to return the eggs and embryos, undamaged, to Plaintiffs.

89.     As a result of the UH Defendants' wrongful conduct, as set forth herein, Plaintiffs have been deprived of the opportunity to use their eggs and embryos and have suffered and continue to suffer damages in an amount to be determined at trial.

### COUNT V
### (PROMISSORY ESTOPPEL AGAINST THE UH DEFENDANTS)

90.     Plaintiffs repeat and reallege the above paragraphs as if fully restated herein.

91.     The UH Defendants promised to store, preserve, protect and deliver on request Plaintiffs' frozen embryos and eggs.

92.     In reliance upon the UH Defendants' promises and representations that the Center would store and maintain Plaintiffs' eggs and embryos at a safe and proper temperature, Plaintiffs entrusted the UH Defendants with their frozen eggs and embryos to store at the Center and did not transfer their frozen eggs and embryos to another storage facility.

93.     Plaintiffs reasonably and foreseeably relied on the UH Defendants' promises.

94.     As alleged herein, the UH Defendants' breached their promises to Plaintiffs by failing to preserve and protect Plaintiffs' eggs and embryos from irreparable damage.

95.     As a direct and proximate results of Plaintiffs' reliance on the UH Defendants' promises, Plaintiffs embryos have been destroyed and have suffered and continue to suffer damages in an amount to be determined at trial.

## COUNT VI
### (NEGLIGENT MISREPRESENTATION AGAINST UH DEFENDANTS)
.
96.     Plaintiffs repeat and reallege the above paragraphs as if fully restated herein

97.     The UH Defendants represented to Plaintiffs that the Center's IVF laboratory featured advanced technology.  The UH Defendants also told Plaintiffs that the Center had appropriate safeguards in place to protect against an equipment failure, including that back-up freezer systems and/or liquid nitrogen holding facilities are available to decrease the likelihood that equipment failures could harm Plaintiffs' frozen eggs and embryos that would be stored at the Center.

98.     Plaintiffs relied on the UH Defendants' representations when they decided and continued to store their frozen eggs and embryos at the Center.

99.     As the facts alleged herein show, the Center's representations were false.  The Center did not have appropriate safeguards in place to protect Plaintiffs' eggs and embryos from equipment failure on March 3.

100.    The UH Defendants' failure to move Plaintiffs' eggs and embryos from the defective tank despite having notice for several weeks that the storage tank was not functioning properly contradicts the UH Defendants' previous representation to Plaintiffs that the Center had back-up freezer systems and/or liquid nitrogen holding facilities available to decrease the likelihood of equipment failure.

101.    The UH Defendants thus misrepresented to Plaintiffs that there were back-up freezer systems and/or liquid nitrogen holding facilities available in case there was an equipment malfunction.

102.    As a result, the UH Defendants failed to exercise reasonable care or competence in obtaining or communicating the false information that they had back-up freezer systems and/or liquid nitrogen holding facilities available in case there was an equipment malfunction.

103.    For example, the Center knew that the storage tank containing Plaintiffs' embryos needed preventative maintenance and that the tank was not functioning properly for several weeks. The Center, however, did not move the eggs and embryos to a backup freezer system and/or liquid nitrogen holding facility to protect the eggs and embryos.

104.    The UH Defendants also failed to have appropriate safeguards in place to alert them of any issues with the defective storage tank that held Plaintiffs' eggs and embryos. Following the March 2018 incident that led to the destruction of Plaintiffs' eggs and embryos, the Ohio Department of Health and the Centers for Medicare and Medicaid Services released a report addressing the incident ("CMS Report"). According to the CMS Report, the UH Defendants experienced an issue with the liquid nitrogen autofill sensor in the tank that held Plaintiffs' eggs and embryos in January 2018. This issue should have triggered notification to the Center's designated contact person. However, the UH Defendants' contact person never received an alert

via the remote alarm that there was an issue.  The report also states that the UH Defendants did not investigate why they did not receive an alert from the remote alarm. The temperature fluctuation that led to the destruction of Plaintiffs' eggs and embryos between March 3 and 4, 2018 should have triggered the remote alarm, but the UH Defendants were not notified of any such alarm and report that the alarm had been turned off for a period of time.

105.    As a proximate result of one or more of the UH Defendants' negligent misrepresentations, Plaintiffs suffered and continue to suffer injuries of a personal and pecuniary nature in an amount to be determined at trial.

### COUNT VII
### (PUNITIVE DAMAGES AGAINST ALL DEFENDANTS)

106.    Plaintiffs repeat and reallege the above paragraphs as if fully restated herein.

107.    The UH Defendants, as stated by their CEO, knew that Plaintiffs were counting on them to protect their eggs and embryos.

108.    The UH Defendants' CEO admitted that the loss Plaintiffs experienced was the UH Defendants' fault because a remote alarm system that was designed to alert staff in the event there was a problem was turned off.

109.    The UH Defendants also explained that the tank that Plaintiffs' eggs and embryos were stored in was having problems for several weeks.

110.    The aforementioned CMS Report indicates that the UH Defendants were aware the storage tank containing Plaintiffs' embryos and eggs experienced an issue with the liquid nitrogen autofill sensor in January 2018.  The UH Defendants were also aware that despite this issue, a remote alarm was not received by the Center's staff.  The report provides that the UH Defendants did not investigate why a remote alarm was not received following the January incident.  By allowing an alarm system to stay off that would have alerted staff that there was a problem in the

tank storing Plaintiffs' eggs and embryos, the UH Defendants and CAS acted recklessly and/or willfully and wantonly and/or consciously disregarded the rights and safety of Plaintiffs' eggs and embryos in a manner they knew or should have known had a great probability of causing substantial harm, and in fact, did cause substantial harm to Plaintiffs.

111. Defendants also admitted that they knew the tank which was storing Plaintiffs' eggs and embryos was malfunctioning for several weeks before this tragic event.

112. By allowing Plaintiffs' eggs and embryos to stay in a tank that was having issues without putting in place additional procedures and/or backup plans in place was reckless and/or willful and wanton and/or consciously disregarding the rights and safety of Plaintiffs' eggs and embryos in a manner they knew or should have known had a great probability of causing substantial harm, and in fact, did cause substantial harm to Plaintiffs.

113. Plaintiffs demand judgment against Defendants, in an amount in excess of Seventy-Five Thousand Dollars ($75,000.00) in compensatory damages and an amount in excess of Seventy-Five Thousand Dollars ($75,000.00) in punitive damages, together with interest, reasonable attorney fees, the costs of this action and whatever further relief this Court deems just and equitable.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs, respectfully request that the Court enter judgment in their favor and against Defendants, University Hospitals Health System, Inc., University Hospitals Cleveland Medical Center, University Hospitals Ahuja Medical Center, Inc., and Computer Aided Solutions LLC d/b/a CAS Data Loggers as follows:

1. Compensatory, consequential, and general damages in an amount to be determined at trial;

2.      Statutory damages, and punitive or exemplary damages, to the fullest extent permitted by law, in an amount to be determined at trial;

3.      With regard to Count I, Negligence and Gross Negligence against the UH Defendants, compensatory damages in excess of $75,000, as well as punitive damages in excess of $75,000, the total amounts to be determined at trial;

4.      With regard to Count II, Negligence and Gross Negligence against Defendant CAS, compensatory damages in excess of $75,000, as well as punitive damages in excess of $75,000, the total amounts to be determined at trial;

5.      With regard to Count III, Breach of Contract against the UH Defendants, compensatory damages in excess of $75,000, the total amount to be determined at trial;

6.      With regard to Count IV, Breach of Contract against Defendant CAS, compensatory damages in excess of $75,000, the total amount to be determined at trial;

7.      With regard to Count V, Bailment against the UH Defendants, compensatory damages in excess of $75,000, the total amount to be determined at trial;

8.      With regard to Count VI, Promissory Estoppel against the UH Defendants, compensatory damages in excess of $75,000, the total amount to be determined at trial;

9.      With regard to Count VII, Negligent Misrepresentation against the UH Defendants, compensatory damages in excess of $75,000, as well as punitive damages in excess of $75,000, the total amounts to be determined at trial;

10.     With regard to Count VIII, Punitive Damages against all Defendant, punitive or exemplary damages, to the fullest extent permitted by law, in an amount to be determined at trial;

11.     Equitable relief as sought herein;

12.     Costs and disbursements of the action, prejudgment interest, and reasonable attorneys' fees, including fees and expenses; and

13.    All such other relief as is deemed just and proper.

January 24, 2019                         Respectfully submitted,

                                         */s/Mark A. DiCello*
                                         Mark A. DiCello (0063924)
                                         Robert F. DiCello (0072020)
                                         Kenneth P. Abbarno (0059791)
                                         Mark M. Abramowitz (0088145)
                                         **DɪCELLO LEVITT**
                                         7556 Mentor Avenue
                                         Mentor, Ohio 44060
                                         Tel:  440-953-8888
                                         Fax: 440-953-9138
                                         madicello@dlcfirm.com
                                         rfdicello@dlcfirm.com
                                         kabbarno@dlcfirm.com
                                         mabramowitz@dlcfirm.com
                                         ***Counsel for Plaintiffs***

## DEMAND FOR JURY TRIAL

Plaintiffs demand a jury trial on all claims so triable.

                                         Respectfully submitted,

                                         */s/Mark A. DiCello*
                                         Mark A. DiCello (0063924)
                                         Robert F. DiCello (0072020)
                                         Kenneth P. Abbarno (0059791)
                                         Mark M. Abramowitz (0088145)
                                         ***Counsel for Plaintiffs***

24